UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| **DANIEL M. MCKAY** * * * | |
| vs.   * * | **COMPLAINT** (Jury Trial Requested) |
| * * | |
| **CSX TRANSPORTATION, INC.** * * | |

**COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY**

Daniel M. McKay, through undersigned counsel, hereby submits the following complaint against CSX Transportation, Inc., pursuant to '20109 of the Federal Rail Safety Act 49 U.S.C. '20109, for the reasons set forth below:

**Parties**

1.     Plaintiff, Daniel M. McKay, is a resident of the State of South Carolina and resides in Abbeville, South Carolina.

2.     Defendant, CSX Transportation, Inc. (hereinafter Defendant CSX) is a Florida corporation with its principal place of business in Jacksonville, Florida.

3.     Defendant is and has been doing business, and has committed acts and caused damages, in this judicial district at all times relevant hereto.

**Jurisdiction and Venue**

4.     This Court has original jurisdiction pursuant to 49 U.S.C. '20109(d)(3) because a

1

complaint was timely filed with the Secretary of Labor within 180 days of the adverse action that is at issue herein, the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint, and the delay in filing this action was not due to the bad faith of Plaintiff. Pursuant to FRSA 49 U.S.C. 20109(d)(3), the plaintiff now is bringing this original action at law and equity for de novo review by a United States District Court which has jurisdiction over this FRSA action without regard to the amount in controversy.

5. Furthermore, this is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Accordingly, subject matter jurisdiction herein is also based upon 28 U.S.C. '1332.

6. Venue is proper in this judicial district pursuant to 29 U.S.C. '2617, and 28 U.S.C. '1391(b) and (c) because Defendant is doing business and resides in this judicial district as defined by 28 U.S.C. '1391(c), a substantial part of the events or omissions giving rise to this claim occurred in this district and Defendants have violated Federal laws in this district.

7. Venue is proper in the Florence division in this judicial district because Florence, SC is the Defendant's principle place of business within the state of South Carolina.

**FACTS**

8. On February 16, 2003, McKay was hired as a locomotive engineer for CSX transportation, located at 907 E. Boundary, Augusta, GA 30901. McKay was a member of the Brotherhood of Locomotive Engineers and Trainmen union.

9. On or around November 12, 2019, as Complainant was stepping out of a locomotive in Charleston, SC, his foot slipped, and he felt a twinge in his left knee. He immediately felt

2

discernible but relatively mild pain, leading McKay to conclude that the pain would gradually subside.

10. After arriving at his hotel a few hours after the injury, he noticed the knee was beginning to swell. When he walked to a nearby establishment to eat, the swelling and pain intensified.

11. By early the next morning, November 13, 2019, the pain had increased significantly so he reported the workplace injury to his trainmaster, Robert Washington.

12. Another trainmaster, Daniel Suber, immediately drove McKay to the emergency room where he was initially diagnosed with a left knee sprain and was instructed to follow up with his primary care physician.

13. On November 18, 2019, McKay visited an orthopedic surgeon who suspected a meniscus or ligament tear and recommended an MRI.

14. The MRI revealed a radial meniscus tear and the orthopedist recommended arthroscopic surgery, which was performed on December 13, 2019.

15. On November 19, 2019, a mere seven days after the workplace injury, and a day after McKay was diagnosed with a meniscus tear, he received a notice that he was being formally investigated for being dishonest and that he falsified information concerning an alleged on-duty injury that occurred on November 12, 2019. The letter further advised the he was being held out of service pending this investigation.

16. After several continuances due to McKay's medical condition, the hearing was eventually held on February 17, 2020. The hearing was actually a sham conducted by several CSX supervisors with no independent arbiters and McKay was only represented by a local union

chairman. Curiously, key witnesses, such as co-workers and Daniel Suber who drove McKay to the emergency room, were conveniently absent from the hearing

17. At the hearing, McKay's supervisor, Robert Washington, confirmed that McKay reported his injury the morning of November 13, 2020, and that the report didn't sit well with myself.

18. Mr. Washington also testified that after receiving McKay's injury report, he immediately went to McKay's hotel to obtain surveillance video of McKay walking around the premises.

19. Mr. Washington provided no justification for his immediate quest for the surveillance video but was clearly engaging in a fishing expedition in a desperate effort to locate inculpatory evidence that would justify a fortuitous pretext that would justify a predetermined adverse action for reporting an injury.

20. The videos depict nothing more than McKay checking into his hotel and walking to a nearby eating establishment, which was never in dispute.

21. After presenting the videos at the hearing, Washington testified that in his opinion, the videos somehow showed that McKay was not injured when he arrived at the hotel so he must have suffered the injury when he visited the nearby establishment.

22. The fact that McKay's orthopedist indicated that meniscus tears do not always manifest until hours after the injury was disregarded.

23. The remainder of the hearing consisted of self-serving, conclusory narrations from Washington and other CSX representatives that they could somehow readily conclude from the videos that the injury was not work related in spite of having no medical training or other

supporting evidence whatsoever.

24. Even though Washington immediately scurried to obtain surveillance video, neither he nor any other CSX employee could describe the maintenance history of the locomotive in question or identify the last time the locomotive was painted with non-slip paint.

25. Interestingly, all witnesses testified that they believed McKay actually suffered an injury, but that somehow it was not work related.

26. At the hearing, McKay also advised that he was reluctant to report his injury based on his prior experience as a CSX supervisor where CSX routinely discouraged injury reporting.

27. Unsurprisingly, on March 17, 2020, McKay received a letter stating that you were dishonest when you falsified information concerning an alleged on-duty injury that occurred on November 12, 2019 and you are dismissed in all capacities from the service of CSX Transportation effective immediately.

28. McKay has been unemployed since he was wrongfully and unlawfully terminated and is enduring substantial financial hardship as a result.

29. Even if CSX ever uncovers a shred of evidence that the injury was not work-related, such fact does not shield it from the mandates of the FRSA since according to established jurisprudence, even if a pretext is true, an employee will still prevail if the pretext was only one of the reasons for the adverse action and another reason is the employee's protected activity. As clearly indicated above, the pretext here is evidenced by the fact that CSX sought surveillance video of McKay immediately after reporting his injury with no evidence whatsoever that he was injured while off duty. The search was conducted merely to uncover whatever evidence CSX could find in order to justify a pretext that it believed would support an unlawful termination. When CSX

found no such evidence, it asserted the unsubstantiated pretext anyway.

30. The protected activity of reporting his workplace injury was clearly a contributing, if not the sole factor in the adverse action since the evidence on which it solely relies, the offsite surveillance videos, would not have been obtained in the first place unless CSX decided to unlawfully investigate McKay immediately after he reported a workplace injury.

31. On May 14, 2020, Plaintiff timely filed a whistleblower complaint with the U.S. Department of Labor-OSHA.

32. The OSHA investigator erroneously dismissed the complaint on September 2, 2020 and Plaintiff timely filed objections and a request for hearing with the Office of Administrative Law Judges on September 26, 2020.

33. A hearing on the matter was held in Newport News, Virgina on November 8, 2023 and November 9, 2023.

34. The administrative Law Judge issued an order on April 24, 2025.

35. Since there has been no final order of the Secretary and 210 days have passed since the filing of his original complaint, and there having been no showing of delay due to bad faith of Plaintiff,  Plaintiff is therefore exercising his right to proceed in a district court of the United States pursuant to the provision of the FRSA, 49 U.S.C. 20109(d)(3).

**VIOLATIONS AND RELIEF SOUGHT**

36. Section 20109 of the Federal Rail Safety Act, 49 U.S.C. ' 20109, provides that a railroad engaged in interstate commerce (such as CSX) shall not, among other things, reprimand, punish, or discharge an employee for reporting to a supervisor that he suffered a work-related

6

injury, or for following the orders of a treating physician because of the work-related injury.

37. CSX retaliated against McKay by subjecting him to a sham investigation for reporting a workplace injury, recklessly and falsely accusing him of fraud and dishonesty, and ultimately firing him, all in response to his engaging in protected activity, in clear violation of 49 U.S.C. ' 20109.

38. The phony excuse for firing McKay proffered by CSX, i.e., that he was dishonest in reporting an injury that was somehow not work related, is clearly retaliatory, particularly considering that no one disputes that he was actually injured, no one testified at his disciplinary hearing that he could not have been injured while working, and the only that the injury was not work related was conjecture from supervisors who admitted they were not happy about receiving the injury report in the first place.

39. The act of placing McKay under investigation for purportedly lying about a workplace injury is likewise an adverse action under the FRSA, 49 U.S.C. '20109, since everyone who testified agreed that McKay was injured and there was no evidence that he was injured elsewhere other than the speculative, self-serving, non-medical testimony of CSX supervisors claiming obscure videos somehow show otherwise.

40. Having known of his injuries as clearly set forth herein, CSX knew that McKay engaged in activity that was protected under Section 20109.

41. CSX's decision to terminate McKay was motivated at least in part by its longstanding policy and history of discouraging injury reporting and retaliating against employees who in fact report workplace injuries.

42. CSX's proffered reason for termination was not a true reason but instead a pretext

as evidenced by the temporal proximity between McKay's initial report of a workplace injury and the adverse action, i.e., an immediate and unwarranted search for surveillance video, a subsequent, concocted investigation, and a sham hearing, all quickly followed by an unexplained and unjustified termination.

43. Unless OSHA and the Department of Labor stop CSX's improper, outrageous and habitual pattern of firing employees, such as McKay who engage in the protected activity of reporting job-related injuries, CSX will have succeeded with intimidating employees from reporting such injuries.

44. As a result of the CSX's unlawful activity, McKay is entitled to all relief pursuant to 49 U.S.C. 20109 (e) including reinstatement with the same seniority status and benefits he had prior to the discriminatory termination, expungement of his disciplinary record, back pay with interest and compensatory damages and economic loss, including compensation for any special damages sustained as a result of the discrimination, litigation costs, expert witness fees, unlimited damages for emotional distress and reasonable attorney fees. Moreover, CSX should be subjected to a hefty sanction of punitive damages of up to $250,000 under 49 '20109 (e)(3) to deter it from continuing to engage in the outrageous practice of firing employees who report workplace injuries.

43. Plaintiff hereby demands a trial by jury according to Fed. Rule Civ. Pro. 38.

WHEREFORE, Plaintiff, Daniel M. McKay, prays for entry of judgment against Defendant for all damages and equitable relief to which Plaintiff may be entitled, including:

A. reinstatement with the same seniority status and benefits he had prior to the discriminatory termination;

B. expungement of his disciplinary record;

C. all applicable backpay with interest;

D. compensatory damages and economic loss;

E. special damages sustained as a result of the discrimination;

F. all litigation costs and expert witness fees;

G. unlimited damages for emotional distress;

H. punitive damages of up to $250,000 under 49 '20109 (e)(3) to deter CSX from continuing to engage in the outrageous practice of firing employees who report workplace injuries;

I. all attorney's fees and costs incurred in prosecuting this action.

RESPECTFULLY SUBMITTED,

PARKER LAW GROUP, LLP

BY: s/Randolph Murdaugh, IV
Randolph Murdaugh, IV
101 Mulberry Street E
P.O. Box 487
Hampton, SC 29924
Phone: (803)903-1781
rmurdaugh@parkerlawgroupsc.com
ATTORNEYS FOR PLAINTIFF

May 7, 2025
Hampton, South Carolina